# No. 09-56675

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

———————————————

### JAMES "JIM" BROWN,

*Plaintiff and Appellant,*

v.

### ELECTRONIC ARTS, INC.,

*Defendant and Respondent.*

———————————————

On Appeal From The United States District Court
Central District Of California No. 2:09-CV-01598-FMC-RZ
The Honorable Florence-Marie Cooper

———————————————

# APPELLANT'S  OPENING  BRIEF

———————————————


**MANATT, PHELPS & PHILLIPS, LLP**
Ronald S. Katz  (Cal. Bar No. 085713)
Ryan S. Hilbert  (Cal. Bar No. 210549)
1001 Page Mill Road, Building 2
Palo Alto, CA  94304-1006
(650) 812-1300  •  Fax (650) 213-0260

**MANATT, PHELPS & PHILLIPS, LLP**
Mark S. Lee  (Cal. Bar No. 94103)
Craig J. De Recat (Cal. Bar No. 105567)
Benjamin G. Shatz  (Cal. Bar No. 160229)
11355 West Olympic Boulevard
Los Angeles, CA  90064-1614
(310) 312-4000  •  Fax (310) 312-4224

*Attorneys for Appellant*
JAMES "JIM" BROWN

# TABLE OF CONTENTS

Page

I. INTRODUCTION ................................................................... 1

II. JURISDICTIONAL STATEMENT .......................................... 3

III. ISSUE AND STANDARD OF REVIEW ................................. 3

IV. STATEMENT OF FACTS ...................................................... 4

    A.   Jim Brown Is A Famous Professional Football Player With A Valuable Publicly-Known Persona ......... 4

    B.   EA Earns Hundreds of Millions Of Dollars From Its Madden NFL Videogames, Which Include Images Of Retired Players On Vintage Teams ............... 5

    C.   EA Used Brown's Likeness And Persona In Its Madden NFL Videogames, But "Scrambled" His Image In A Way Such That He Was Still Easily Recognizable ................................................................. 8

    D.   EA Actively Attempted To Conceal Its Misconduct In Using Brown's Likeness ...................... 12

    E.   Brown Filed Suit Against EA For Trademark Infringement And For Violating His Rights Of Publicity ....................................................................... 12

    F.   The District Court Erroneously Dismissed Brown's Trademark Claim By Making The Factual Finding That There Were No Explicit Representations Of Endorsement To Cause Consumer Confusion .................................................... 16

V. SUMMARY OF ARGUMENT ............................................. 17

VI. ARGUMENT ....................................................................... 19

    A.   Brown Has A Mark In His Likeness And Persona That Qualifies As Property ........................................... 19

        1.   Brown Owns A Mark In His Likeness And Persona For False Endorsement Purposes .......... 19

        2.   Brown's Mark Is Constitutionally Protected Intellectual Property .......................................... 22

# TABLE OF CONTENTS

Page

3. It Has Long Been Established That The Public Believes That Products Cannot Bear A Celebrity's Mark Unless The Celebrity Grants Permission For That Use ......................... 24

B. Instead Of Accepting The Allegations Of Brown's Complaint As True, The District Court Erroneously Found A Fact Contrary To Those Allegations ..................................................... 25

C. Alternatively, EA's Conduct Is Actionable Under Every Trademark-Versus-Free Speech Approach Adopted By This Court ................................. 26

1. The *Rogers* Balancing Test Establishes Two Prongs For A First Amendment Defense .......... 27

a. The *Rogers* Test Is Inapplicable To Brown's Case .......................... 29

b. The "Artistic Relevance" Prong Of The Balancing Test Should Not Have Been Decided On A Motion To Dismiss Because It Requires Findings Of Fact ..................................... 32

c. The "Explicitly Misled" Prong Of The Balancing Test Also Requires Fact-Finding And Therefore Should Not Be Decided On A Motion To Dismiss ..... 36

2. The *Dr. Seuss* "Likelihood Of Confusion" Standard Also Favors Reversal .......................... 41

3. The District Court's Ruling Should Be Reversed Under The "Alternative Means" Standard ............................................. 42

VII. Reversal Of The Dismissal Of Brown's Federal Claim Also Requires Reversal Of The District Court's Declining To Exercise Supplemental Jurisdiction Over Brown's State Law Claims .................................... 45

VIII. CONCLUSION .................................................... 46

ii

# TABLE OF AUTHORITIES

**Page**

## CASES

*Abdul-Jabbar v. General Motors Corp.*,
  85 F.3d 407 (9th Cir. 1996) ......................................................... 21

*American Dairy Queen Corp. v. New Line Prods., Inc.*,
  35 F. Supp. 2d 727 (D. Minn. 1998) ............................................. 35

*Bollard v. Cal. Province of the Soc'y of Jesus*,
  196 F.3d 940 (9th Cir. 1999) ....................................................... 46

*City of L.A. v. County of Kern*,
  581 F.3d 841 (9th Cir. 2009) ....................................................... 46

*Coca-Cola Co. v. Purdy,*
  382 F.3d 774 (8th Cir. 2004) ....................................................... 41

*College Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*,
  527 U.S. 666 (1999) .............................................................. 22, 23

*Comm. Concerning Cmty. Improvement v. City of Modesto*,
  583 F.3d 690 (9th Cir. 2009) ....................................................... 45

*Dallas Cowboy Cheerleaders, Inc. v. Pussycat Cinema, Ltd.,*
  604 F.2d 200 (2d Cir. 1979) ........................................................ 43

*Downing v. Abercrombie & Fitch*,
  265 F.3d 994 (9th Cir. 2001) ................................................... 22, 42

*Dr. Seuss Enters., L.P. v. Penguin Books USA*,
  109 F.3d 1394 (9th Cir. 1997) ............................................... passim

*Dryer v. National Football League*,
  689 F. Supp. 2d 1113 (D. Minn. 2010) ................................... passim

*Elvig v. Calvin Presbyterian Church*,
  375 F.3d 951 (9th Cir. 2004) ....................................................... 46

*Elvis Presley Enters., Inc. v. Capece,*
  141 F.3d 188 (5th Cir. 1997) ....................................................... 42

**TABLE OF AUTHORITIES**
**(continued)**

Page

*ESS Entertainment 2000, Inc. v. Rock Star Videos, Inc.*,
  547 F.3d 1095 (9th Cir. 2008).................................................. passim

*Hamilton-Brown Shoe Co. v. Wolf Bros. & Co.*,
  240 U.S. 251 (1916) ....................................................................... 23

*Hoffman v. Capital Cities/ABC, Inc.*,
  255 F.3d 1180 (9th Cir. 2001) ........................................................ 26

*International Olympic Committee v. San Francisco Arts & Athletics*,
  781 F.2d 733 (9th Cir. 1986), *reh'g en banc denied*,
  789 F.2d 1319 (9th Cir. 1986), *aff'd on other grounds*,
  *SFAA, Inc. v. USOC*, 483 U.S. 522 (1987) ....................3, 19, 42-45

*Manzarek v. St. Paul Fire & Marine Ins. Co.*,
  519 F.3d 1025 (9th Cir. 2008) .......................................................... 3

*Marder v. Lopez*,
  450 F.3d 445 (9th Cir. 2006) .......................................................... 26

*Mattel, Inc. v. MCA Records, Inc.*,
  296 F.3d 894 (2002) ............................................................... passim

*Miller v. Glenn Miller Prods., Inc.*,
  454 F.3d 975 (9th Cir. 2006) .......................................................... 23

*Mishawaka Rubber & Wollen Mfg. Co. v. S.S. Kresge, Co.*,
  316 U.S. 203 (1942) ................................................................. 20, 21

*Mutual of Omaha Ins. Co. v. Novak*,
  836 F.2d 397 (8th Cir. 1987) .......................................................... 43

*Parks v. LaFace Records*,
  329 F.3d 437 (6th Cir. 2003) ................................................... passim

*Polar Bear Prods., Inc. v. Timex Corp.*,
  384 F.3d 700 (9th Cir. 2004) .......................................................... 23

*Rogers v. Grimaldi*,
  875 F.2d 994 (2d Cir. 1989) .................................................... passim

*SFAA v. USOC*,
  483 U.S. 522 (1987) ................................................................42-46

iv

# TABLE OF AUTHORITIES
## (continued)

Page

*Waits v. Frito-Lay, Inc.*,
  978 F.2d 1093 (9th Cir. 1992) ...................................................... 21

*Wendt v. Host Int'l., Inc.*,
  125 F.3d 806 (9th Cir. 1997) .................................................. 21, 22

*White v. Samsung Elecs. Am., Inc.*,
  971 F.2d 1395 (9th Cir. 1992) ............................................... 21, 22

*Yuba River Power Co. v. Nev. Irrigation Dist.*,
  279 P. 128 (Cal. 1929) ................................................................. 22

*Zacchini v. Scripps-Howard, Inc.*,
  433 U.S. 562 (1977) ..................................................................... 43

## STATUTES

15 U.S.C. § 1114 ............................................................................ 20

15 U.S.C. § 1125(a) ................................................................... 3, 20

15 U.S.C. § 1127 ............................................................................ 19

28 U.S.C. § 41 .................................................................................. 3

28 U.S.C. § 1291 .............................................................................. 3

28 U.S.C. § 1294(1) ......................................................................... 3

28 U.S.C. § 1331 .............................................................................. 3

28 U.S.C. § 1338 .............................................................................. 3

28 U.S.C. § 1367 .............................................................................. 3

Cal. Bus. & Prof. Code §§ 17200 *et seq.* ................................... 13

Cal. Civ. Code § 654 ..................................................................... 22

## TREATISE

2 McCarthy on Trademarks and Unfair Competition
  § 10:43 (4th ed. 2010) ...................................................... 18, 25, 39

## I.     INTRODUCTION

Plaintiff and Appellant Jim Brown, now seventy-four years old, is a football legend and public figure with a valuable persona.  When Brown learned that Defendant Electronic Arts (EA) was using his image and persona as an avatar in its very profitable *Madden NFL* videogames without his permission, he filed suit for federal trademark (Lanham Act) violation and state law right of publicity claims.  On EA's motion to dismiss, the district court dismissed the Lanham Act claim, concluding that EA had a First Amendment right to profit by including Brown's likeness in its games.  Having disposed of Brown's federal claim, the district court then declined to exercise supplemental jurisdiction over his state law claims.  This Court should reverse those rulings.

The "core purpose" of trademark law is to avoid confusion in the marketplace.  In the context of that core purpose, "a trademark owner's property rights play well with the First Amendment."  *Mattel, Inc. v. MCA Records, Inc.*, 296 F.3d 894, 900 (2002) (Kozinski, J.).  The operative complaint in this matter clearly and repeatedly alleged that EA engaged in practices that explicitly caused such confusion — allegations that are supported by authority from the leading trademark

treatise, which states that over 90% of consumers believe that the use of a celebrity image in a product means that the image is licensed. Nonetheless, the district court found that "there are no explicit representations of endorsement to cause consumer confusion." (1:1-ER-9.)[1] Because that factual finding could not be made on this record in a motion to dismiss proceeding, the dismissal of Brown's trademark claim should be reversed, and supplemental jurisdiction of his state law claims should be reinstated.

Alternatively, reversal should occur based on any of the standards used by this Court in the context of trademarks and the First Amendment:

- the *Rogers* balancing test (adopted by *ESS Entertainment 2000, Inc. v. Rock Star Videos, Inc.*, 547 F.3d 1095 (9th Cir. 2008) and *Mattel v. MCA*, 296 F.3d 894, from *Rogers v. Grimaldi*, 875 F.2d 994 (2d Cir. 1989));

- the likelihood of confusion standard (set forth in *Dr. Seuss Enterprises, L.P. v. Penguin Books USA*, 109 F.3d 1394 (9th Cir. 1997)); and

---

[1]  Excerpts of Record citations take the form "*volume:tab(exhibit)*-ER-*page(s)*."

- the alternative means test (set forth in *International Olympic Committee v. San Francisco Arts & Athletics*, 781 F.2d 733 (9th Cir. 1986), *reh'g en banc denied*, 789 F.2d 1319 (9th Cir. 1986), *aff'd on other grounds*, *SFAA, Inc. v. USOC*, 483 U.S. 522 (1987)).

## II.    JURISDICTIONAL STATEMENT

Brown sued EA for false endorsement under the Lanham Act, 15 U.S.C. § 1125(a), and for California state law right of publicity claims, arising from EA's use of Brown's persona in its videogames. The district court thus had original jurisdiction over the federal claim and supplemental jurisdiction over the state law claims.  28 U.S.C. §§ 1331, 1338, 1367.  This Court has appellate jurisdiction over Brown's timely appeal of the final judgment dismissing all his claims. 28 U.S.C. § 41, 1291, 1294(1).

## III.   ISSUE AND STANDARD OF REVIEW

Did the district court erroneously dismiss Brown's Lanham Act claim by finding facts contrary to the allegations in Brown's complaint?

This is a question of law reviewed *de novo*.  *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1030-31 (9th Cir. 2008).

3

## IV.    STATEMENT OF FACTS

### A.    Jim Brown Is A Famous Professional Football Player With A Valuable Publicly-Known Persona

Jim Brown is a former collegiate and professional football player who has been inducted into both the college and professional football Halls of Fame.  (2:2-ER-13-14.)  Perhaps best known as the record-breaking running back for the National Football League's Cleveland Browns from 1957 to 1965, Brown was selected by the *Sporting News* as the greatest football player of all time, and has been designated a number one player in the "All Madden, All Millennium" football team.  (*Id.*; 2:8(L)-ER-237.)

Brown subsequently parlayed the fame he gained through his extraordinary athletic accomplishments into a career in entertainment (e.g., film and television roles) and public service (e.g., founding the Amer-I-Can program to offer inner-city youth an alternative to gang life).  (2:2-ER-14; 2:5(U)-ER-138-39.)  Through his hard work, unique achievements, and public service, Brown has become widely known to the public, and has developed substantial goodwill in his likeness and persona.  (2:2-ER-13-15.)

4

**B.     EA Earns Hundreds of Millions Of Dollars From Its *Madden NFL* Videogames, Which Include Images Of Retired Players On Vintage Teams**

EA is a multi-billion dollar videogame company.  (2:2-ER-16.) EA sells a number of sports-centered videogames, including a series of videogames involving professional football players called *Madden NFL*.  (*Id.*)  EA's *Madden NFL* is among its most popular products:  EA sold more than two million copies of the *Madden NFL* 2009 edition in its first month of sale alone.  (*Id.*)

EA prides itself on the authentic nature of its *Madden NFL* videogames.  Each annual edition of *Madden NFL* features virtual versions of the same football teams that exist for the then-current NFL season, and depicts approximately 1,500 current NFL players.  (2:5-ER-96.)  It uses the team trademarks and current NFL players' likenesses pursuant to licenses it obtains from the NFL and the National Football League Players' Association ("NFLPA").  (2:5-ER-96-97; 2:2-ER-18; 2:3-ER-34.)

Until recently, EA also included vintage teams in its *Madden NFL* games (variously called "classic" or "historic" teams in different editions of the game).  (2:3-ER-35; 2:5-ER-96.)  EA's vintage teams include some of the best and most popular football

5

teams in NFL history, including the champion 1965 Cleveland Browns team on which Jim Brown starred. (2:5-ER-96.) With this feature, gamers can pit these vintage teams against each other or against teams from the modern era. (*Id.*) EA has actively promoted the presence of vintage players in *Madden NFL*, stating in written "game features" materials which accompanied its game that *Madden NFL* features "**Real Old School Teams And Players** -- Fifty of the NFL's greatest players and every All-Madden team plus old-school teams with old-school uniforms and old-school attitude." (2:8(F)-ER-227.)

EA's *Madden NFL* games use the likenesses and a number of other precise and identifiable attributes of the depicted players, including their appearance, movements, skills, team, position, and other elements. The virtual players in the game look, move, act and perform just as the real NFL players do or did. (See, e.g., 2:5-ER-107-114 [actual videogames lodged].) The object of EA's *Madden NFL* games is to use virtually photo-realistic digital animation to recreate, as authentically and realistically as possible, each featured player's likeness and persona as a member of the team on which he plays. For example, the introduction to the "game

features" material referenced above states: "With legendary Madden gameplay and eye-popping, in-your-face graphics, experience all the speed, power, and emotion of the National Football League. This is Madden. This is football." (2:8(F)-ER-227.)

Although EA consistently licenses current NFL players' likenesses from the NFLPA, EA often did not obtain such licenses from retired players. Instead, it "scrambled" retired players' likenesses by making small, superficial changes to each player's likeness, such as changing the player's uniform number (although a feature in the game easily allows the game player to edit the jersey to display the football player's actual number and actual name).[2] EA was told to scramble retired players' likenesses by licensor NFLPA as a cost-containment measure, to avoid compensating the retired NFL players whose likenesses and personas appeared in the game. (2:2-ER-16.)

A jury awarded a group of retired players, which did not include Brown, $21 million in punitive damages because of the NFLPA's breach of fiduciary duty to retired players in connection

---

[2] The record includes the PlayStation®2 versions of the game for 2002 to 2009 (other versions for different platforms, like Xbox, are not part of this record).

7

with that conduct.[3]  The court supervising that action approved a

settlement with the NFLPA in August 2009, but ordered that "any

claims by class members, individually or as a class, against [EA] or

any other licensee of Defendants [the NFLPA and its licensing arm,

Players, Inc.] concerning misuse of their images or identities,

including scrambling, would not be released by the settlement."[4]

C.  **EA Used Brown's Likeness And Persona In Its**
    ***Madden NFL* Videogames, But "Scrambled" His**
    **Image In A Way Such That He Was Still Easily**
    **Recognizable**

Beginning at least in 2001, EA — without Brown's knowledge

or consent — began using Brown's likeness and persona in its

*Madden NFL* videogame.  (2:2-ER-15, 17.)  Brown is depicted in the

game's vintage 1965 Cleveland Browns team and in the game's

All Browns team.  (1:1-ER-3.)  Brown also is a leading member of the

"All Madden, All Millennium" team, and widely recognized as at

least one of the best (if not the best) NFL players of all time.  (2:8(L)-

---

[3]  *Adderley v. NFLPA*, No. C07-943-WHA, 2009 WL 88484 (N.D.
Cal. Jan. 13, 2009) (denying post-trial motion to vacate awards of
$7.1 million in compensatory damages and $21 million in exemplary
damages against the NFLPA for the NFLPA's breach of fiduciary
duty in failing to license certain retired players' rights for use in the
*Madden NFL* videogames).

[4]  *See Adderley*, No. C07-943-WHA (Docket No. 629).

ER-237.) Thus, EA identified Brown in the "gameplay" promotional materials it provided. (2:8(F)-ER-227 (stating that the game includes "Fifty of the NFL's greatest players and every All-Madden team".) EA's games also included an easily recognizable avatar with Brown's appearance, movements, team, position, skill set, and skin color, in a unique combination that would make it obvious to any game player knowledgeable about football that Brown being depicted. (See, e.g., 2:5-ER-107-114 [actual videogames lodged].)

More significantly, it is axiomatic that the '65 Cleveland Browns simply, by definition, cannot be the '65 Cleveland Browns without the players who played for the '65 Cleveland Browns. This fundamental truth applies especially to that team's most famous player, Jim Brown.

Based on the warning that EA received from the NFLPA about retired players, EA intentionally and superficially "scrambled" Brown's image by — in most PlayStation®2 versions of *Madden* — changing his playing number from 32 to 47, to purport to obscure its taking. In the 2003 PlayStation®2 version of *Madden NFL,* Brown's jersey number is the correct 32, but in the 2004-2009 versions it is changed to number 47 (which, as noted above, game players easily

9

can change back to number 32). However, his 1965 age (29), his 1965 years in the league (9), his height (6'2") and his weight (228 lbs.) are all correct and remain the same in all Madden editions. (2:2-ER-16.) Also, his ability rating always remains the same — 99, which is the highest possible ability rating.[5]

EA's artists and game designers insured that this moving image was recognizable as Brown, causing consumers to attach his extensive fame, reputation and personal endorsement to the image. Despite EA's minor change of Brown's jersey number, *Madden NFL* players who select the vintage 1965 Cleveland Browns team on which Brown famously played would find an African-American running back who looked like Brown, played the same position that Brown famously played, moved like Brown, played at the same unprecedented skill

---

[5] These facts are accessible in the games lodged with the Court that are part of the record below. For instance, a player of the 2009 *Madden NFL* may select "features" from the main menu, then "historic teams," then pick the "65 Browns," at which point that team's roster appears. The very first player listed is a dark-skinned, 6'2" African-American fullback, 228 pounds, with 9 years of NFL experience, with a playing ability rating of 99. Selecting that player, from the "edit player" menu, and choosing "information," further reveals that the player is 29 years old and right handed. All of this data matches Brown's actual information at that time. The "edit player" feature also allows users to change various character features, including a variety of skin tones, the jersey number, and even to input the first name "Jim" and last name "Brown," if so desired.

level that Brown famously displayed, and had the same record-breaking statistics that Brown famously earned. EA intentionally failed at effectively scrambling Brown's image so that consumers would think that Brown was endorsing the game.

In the face of these overwhelming facts, EA took the facially incredible position that Brown is not in the *Madden NFL* games. (*E.g.*, 1:1-ER-5; 2:3-ER-28, 39-40 (EA argues it did not use Brown's likeness because it did not use his name, voice, signature, photograph or likeness).)

*Madden NFL* consumers have scoffed at EA's brazen denials. One *Madden NFL* player stated that "[t]o say [Jim Brown is not in the *Madden NFL* game] is like calling the grass purple and hoping that you're talking to a blind man." (2:8(C)-ER-224.) Another consumer stated that to claim that "the running back on the [*Madden NFL* game] could be anyone but Jim Brown is an absolute joke." (2:8(D)-ER-225.) EA's use of Brown's likeness and persona was so obvious that a fan trailer for *Madden NFL '09* identified Jim Brown as one of the first three players depicted in the game. (2:8(I)-ER-232-33.)

11

**D.  EA Actively Attempted To Conceal Its Misconduct In Using Brown's Likeness**

In addition to intentionally failing at "scrambling" Brown's image, EA took other actions to explicitly mislead Brown and the public about its taking and use of Brown's likeness and persona in its games.  Two EA officers, speaking at a seminar on intellectual property and entertainment law in October 2008, represented that EA was able to use the images and likenesses of current and retired NFL players in *Madden NFL* because it obtained their written authorization to do so.  (2:9-ER-242-43.)

Contradicting those representations, EA twice expressly denied to Brown's representatives in 2007, and also in 2008, that EA had used Brown's likeness in *Madden NFL*.  (2:2-ER-17; 2:8(E)-ER-226; 2:8(H)-ER-231.)  Notwithstanding those false EA denials, in November 2008, Brown discovered that EA had used his likeness and persona without his knowledge or consent in *Madden NFL* games dating back at least to 2001.  (2:2-ER-17.)

**E.  Brown Filed Suit Against EA For Trademark Infringement And For Violating His Rights Of Publicity**

Brown filed a complaint (and an amended complaint) against EA alleging false endorsement under the Lanham Act, common law

12

and statutory violations of his rights of publicity, and unfair competition under California Business and Professions Code §§ 17200 *et seq.* (2:2-ER-11-26; 2:13-ER-290, 293.)

EA filed a motion to dismiss and special motion to strike. (2:3-ER-27; 2:4-ER-56.) By invoking the "incorporation by reference" doctrine, the district court considered material outside the complaint, including the videogames in question (which EA supplied as exhibits). (1:1-ER-2, n.1.) Among the materials considered by the district court (despite EA's denials that Brown was even in the videogame), was an explicit reference to actual retired players like Jim Brown being in the game:

> **Real Old School Teams And Players** — Fifty of the NFL's greatest players and every All-Madden team plus old-school teams with old-school uniforms and old-school attitude. (2:8(F)-ER-227.)

Later, however, EA was advised by the NFLPA to "scramble" the images of the retired players like Brown so that payment would not have to be made to the retired players:

> EA was warned to scramble the image of the retired NFL players in a letter from the NFL Players Union as a cost containment measure because EA would

13

need to compensate all players used in the game.  (2:2-
ER-16 ¶21.)

Because successfully scrambling the players like Brown would
defeat EA's purpose of causing the public to think that Brown
endorsed the game, EA explicitly misled the public by making
Brown's avatar recognizable, i.e., by explicitly not scrambling his
image enough to make him unrecognizable.  As Brown alleged:

> Despite this warning [from the NFLPA], EA
> merely made slight changes over the years to Jim
> Brown's image because EA knew the value of using Jim
> Brown's likeness in the Madden video game.  However
> these were only the most superficial of changes and were
> nowhere near enough to transform the image of Brown.
> Of major significance, prior to civil rights legislation the
> vast majority of the NFL players in the 1960s were
> Caucasian or White, EA sports refused to change[] the
> race of the Cleveland Browns running back because of
> its value for authenticity purposes.  (2:2-ER-16 ¶22.)

Brown's complaint also alleged that EA's intentionally-failed
scrambling succeeded in confusing the public.  For example:

- "consumers are likely to believe that multiple editions of
  [EA's] *Madden NFL* video game[] are authorized,

14

sponsored, approved, or otherwise related to [Brown] and his licensees when in fact they are not." (2:2-ER-17 ¶28.)

- "[EA's] conduct involved the appropriation of [Brown's] likeness because the use of [Brown's] image from his playing days implied that he acquiesced to the inclusion of his likeness in several editions of *Madden NFL* and that he was compensated by EA for granting such permission." (2:2-ER-21 ¶58.)

- EA's purpose was "to enhance sales of its *Madden NFL* video game by misleading the public that [Brown] endorsed the use of his likeness in certain editions of *Madden NFL*, including but not limited to, *Madden '08*." (2:2-ER-24 ¶77c.)

- "By intentionally appropriating the likeness and identities of retired NFL players like [Brown], who have never agreed to, nor ever contemplated, authorizing the use of their likeness to be used in connection with a video game, such as [EA's] *Madden NFL*, [EA] has deceived consumers into reasonably believing that all of the former players depicted in various editions of *Madden NFL* have consented to the

15

use of their likeness in the game, thereby creating a

likelihood that [EA's] customers, potential customers, and

the public generally will be confused or misled as to the

source of said endorsement by [Brown] and other retired

NFL players of [EA's] products, merchandise, goods or

services." (2:2-ER-23 ¶76.)

### F. The District Court Erroneously Dismissed Brown's Trademark Claim By Making The Factual Finding That There Were No Explicit Representations Of Endorsement To Cause Consumer Confusion

The district court entered an order granting EA's motion to

dismiss Brown's Lanham Act claim. (1:1-ER-1-10.) The court

assumed that EA had used Brown's likeness and persona (1:1-ER-5,

n. 2), but then concluded that EA's actions constituted speech

protected by the First Amendment. (1:1-ER-9.) The court found

*Madden NFL* to be an expressive artistic work (1:1-ER-7) and then

applied a balancing test. Under that test, the court found that EA's

use of Brown's likeness and persona was (1) relevant for EA's artistic

purposes (despite the fact that EA flatly denied the use of Brown's

image), and (2) did not mislead consumers into believing that Brown

endorsed the videogame. (1:1-ER-8-9.)

Despite the well-pled allegations of Brown's complaint, the district court based its order on a question of fact that it erroneously resolved contrary to the allegations of the complaint, i.e., it found as a matter of fact that "there are no explicit representations of endorsement to cause consumer confusion." (1:1-ER-9.)

The district court also declined to exercise supplemental jurisdiction over Brown's state law claims, and denied EA's motion to strike as moot. (1:1-ER-10.) Brown timely appealed. (2:12-ER-283.)

## V.    SUMMARY OF ARGUMENT

In evaluating a motion to dismiss, a district court must take the facts alleged in the complaint as true. Brown's amended complaint (and the material incorporated by reference and considered by the district court) clearly alleged that EA explicitly misled the public regarding whether Brown endorsed EA's *Madden NFL* videogames. Nonetheless, the district court decided that "there are no explicit representations of endorsement to cause consumer confusion" (1:1-ER-9). This improper fact-finding is reversible error.

The district court should have done exactly what another district court did at the motion-to-dismiss stage in a case involving the use of retired NFL player trademarks in NFL highlight films:

17

> Even if the "explicitly mislead" test is the correct test to
> use (which plaintiffs very much dispute), the Court
> cannot make a determination based solely on the
> pleadings that the NFL's use of Plaintiffs' names and
> images does not explicitly mislead anyone. This is a
> fact-intensive inquiry. It may be that discovery will
> show that there is no likelihood of confusion/explicit
> misleading. But that is a matter for discovery, not for a
> motion for judgment on the pleadings. *Dryer v. National
> Football League*, 689 F. Supp. 2d 1113, 1122 (D. Minn.
> 2010).

Here there is more than just the mere appearance of Brown in the

videogame. There is EA's intentionally-failed scrambling; the

specific references in advertisements and brochures to "Real Old

School Teams and Players"; the public statements that the retired

player images were licensed; and the specific references to Jim Brown

himself (e.g., the All-Madden team references). There is also

authority from the leading trademark treatise explaining that use of a

celebrity's image in a product means, to over 90% of the public, that

the celebrity has licensed his or her image. 2 McCarthy on

Trademarks and Unfair Competition § 10:43 (4th ed. 2010).

Alternatively, the district court should be reversed under every

standard that this Court has developed in the context of trademarks

and the First Amendment, i.e., (1) the *Rogers* balancing standard, used

in *ESS v. Rock Star Videos*, 547 F.3d 1095, and *Mattel v. MCA*, 296

F.3d 894; (2) the likelihood of confusion standard, used in *Dr. Seuss*

*Enterprises, L.P. v. Penguin Books USA*, 109 F.3d 1394 (9th Cir.

1997); and (3) the alternative means test, used in *International*

*Olympic Committee v. San Francisco Arts & Athletics*, 781 F.2d 733

("*IOC*"), *reh'g en banc denied*, 789 F.2d 1319, *aff'd on other*

*grounds*, *SFAA v. USOC*, 483 U.S. 522.

Once the dismissal of the trademark is reversed, then

supplemental jurisdiction over the state law claims must be reinstated.

## VI.    ARGUMENT

### A.    Brown Has A Mark In His Likeness And Persona That Qualifies As Property

#### 1.    Brown Owns A Mark In His Likeness And Persona For False Endorsement Purposes

Generally, a "trademark" symbolizes the goodwill associated

with a person or business, and identifies the source of a product or

service.  15 U.S.C. § 1127.  The Supreme Court has described a

"trademark" and its value as follows:

> The protection of trademark is the law's recognition of
> the psychological function of symbols.  If it is true that
> we live by symbols, it is no less true that we purchase

19

goods by them.  A trademark is a merchandising short-cut which induces a purchaser to select what he wants, or what he has been led to believe he wants.  The owner of a trademark exploits this human propensity by making every human effort to impregnate the atmosphere of the market with the drawing power of a congenial symbol.  If another poaches upon the commercial magnetism of the symbols he has created, the owner can obtain legal redress.

*Mishawaka Rubber & Wollen Mfg. Co. v. S.S. Kresge, Co.,* 316 U.S. 203, 205 (1942).

The owner of a trademark has the exclusive right to control how the mark is commercially exploited, and may prevent unauthorized use by others that could mislead the public as to the source or origin of the goods or services.  15 U.S.C. §§ 1114, 1125(a).

In the celebrity endorsement setting, a celebrity's name, likeness, and other indicia of a celebrity's persona serve as symbols that identify the "source" of the athletic, entertainment, endorsement, or other services that the celebrity performs.  (See below for strong authority that leading commentator, Professor Thomas McCarthy, provides for this proposition.)  Such symbolic representations of celebrities possess a goodwill (in the language of the Supreme Court,

20

a "drawing power" or "commercial magnetism") of significant commercial value to the individual. *See Mishawaka,* 316 U.S. at 205.

For that reason, this Court repeatedly has held that unauthorized commercial use of virtually any indicia of a celebrity's persona can mislead the public into believing that a celebrity endorsed a product or service. *See Wendt v. Host Int'l., Inc.*, 125 F.3d 806, 812-14 (9th Cir. 1997) (use of electronic robotic figures which were physically placed in chain of airport bars and arguably resembled actors from the television program *Cheers* could imply false endorsement under the Lanham Act by evoking the identities of the actors); *Abdul-Jabbar v. General Motors Corp.*, 85 F.3d 407, 412-13 (9th Cir. 1996) (use of professional athlete's former name in television commercial that described his collegiate athletic accomplishments potentially implied endorsement under the Lanham Act even though he had not used the name in years); *Waits v. Frito-Lay, Inc.*, 978 F.2d 1093, 1110-11 (9th Cir. 1992) (imitation of singer's voice in a radio commercial could imply endorsement under the Lanham Act because it evoked his identity); *White v. Samsung Elecs. Am., Inc.*, 971 F.2d 1395, 1400-01 (9th Cir. 1992) (print ad that depicted female robot in a blond wig turning letters in what appeared to be the "Wheel of Fortune" game

21

show set could imply Vanna White's endorsement of the advertised product because it evoked her identity).

Indeed, this Court has expressly and repeatedly stated that in the celebrity endorsement setting, "mark" means the celebrity's persona and the "strength of the mark" refers to the level of recognition the celebrity enjoys. *White*, 971 F.2d at 1400; *Wendt*, 125 F.3d at 811 & n.1; *Downing v. Abercrombie & Fitch*, 265 F.3d 994, 1007 (9th Cir. 2001). The district court here recognized that Brown possessed a "mark" in his persona, and assumed for purposes of its analysis that EA had used Brown's persona in its videogames. (1:1-ER-4-5, 8.)

### 2. Brown's Mark Is Constitutionally Protected Intellectual Property

"Property" has been defined as "everything which one person can own and transfer to another." *Yuba River Power Co. v. Nev. Irrigation Dist.*, 279 P. 128, 129 (Cal. 1929); *see also* Cal. Civ. Code § 654. The Supreme Court and this Court have long recognized that trademarks are "property." *College Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 673 (1999) (Lanham Act "trademarks . . . are the 'property' of the owner because he can

exclude others from using them"); *Hamilton-Brown Shoe Co. v. Wolf Bros. & Co.*, 240 U.S. 251, 259 (1916) ("the right to use a trade-mark is recognized as a kind of property, of which the owner is entitled to the exclusive enjoyment to the extent that it has been actually used"); *Miller v. Glenn Miller Prods., Inc.*, 454 F.3d 975, 979 (9th Cir. 2006) ("a trademark is a common law property right that exists independently of statutory provisions for registration"); *Polar Bear Prods., Inc. v. Timex Corp.*, 384 F.3d 700, 721 (9th Cir. 2004) (a trademark is a property right distinct from copyright).

Several Constitutional provisions recognize and protect property rights. The Fourteenth Amendment, for example, prohibits the taking of property without due process of law. The fact that a trademark is "property" means that it is entitled to such constitutional protection. *See College Sav. Bank*, 527 U.S. at 673 (although there is no "property" right to be free of false advertising, the exclusive right to control a trademark is a "property" right potentially protectable under the Fourteenth Amendment).

This does not mean that the state can never regulate an individual's enjoyment of his or her property.[6]  However, all such restrictions on private property are only exercisable *by the state*, after appropriate administrative, legislative or judicial proceedings.  No statute or constitutional provision permits a private party to simply take and use another's property, even when the party takes the property to exercise a perceived right.  Generally, one private party cannot take another's property, except through successful litigation that complies with due process.

### 3. It Has Long Been Established That The Public Believes That Products Cannot Bear A Celebrity's Mark Unless The Celebrity Grants Permission For That Use

Leading trademark commentator Professor McCarthy provides strong authority supporting reversal, because use of an unlicensed, unpaid-for celebrity image confuses the vast majority of the public regarding endorsement:

---

[6]  Under the Fourth Amendment, the taking of property by the state is permitted, for example, on a showing of probable cause that the property may evidence a crime.  Eminent domain proceedings also permit the taking of private property so long as just compensation is paid.  Further, use of private property can be restricted in certain circumstances by zoning or other laws without qualifying as a "taking" under the Constitution.

In 1983, well-known consumer survey expert Robert Sorenson designed a survey probing public attitudes regarding licensed wearing apparel bearing a picture of a cartoon character. The statement in the survey that elicited the highest degree of consumer agreement was this: "No product can bear the name of an entertainer, cartoon character, or some other famous person unless permission is given for its use of the owner of the name or character." Of the 250 persons interviewed, 91.2 % agreed with that statement and almost 80% indicated the strongest possible level of agreement. 2 McCarthy on Trademarks and Unfair Competition § 10:43 (4th ed. 2010).

The district court here never considered this point. Yet this raises a crucial factual issue: On this record, a jury could find that EA's use of Brown's likeness and persona in *Madden NFL* videogames meant that Brown was endorsing or promoting the game, or at least had given permission for that use. No case in this Circuit (or any other Circuit) has ever held to the contrary.

### B. Instead Of Accepting The Allegations Of Brown's Complaint As True, The District Court Erroneously Found A Fact Contrary To Those Allegations

Under black-letter law, a district court must take the allegations of a complaint as true in a motion to dismiss proceeding. *E.g.,*

*Marder v. Lopez*, 450 F.3d 445, 447 n. 1 (9th Cir. 2006). The district court here, however, made its own finding of fact that there were no attempts to mislead, despite the complaint's allegations and other materials that were before the court to the contrary. This is reversible error.

What the district court should have done was done by another district court in a similar case involving retired NFL player images being used in NFL highlight films. *Dryer*, 689 F. Supp. 2d at 1122. That other district court correctly held that it could not "make a determination based solely on the pleadings that the NFL's use of Plaintiffs' names and images does not explicitly mislead anyone." *Id.*

### C. Alternatively, EA's Conduct Is Actionable Under Every Trademark-Versus-Free Speech Approach Adopted By This Court

This Court has applied four different standards to evaluate First Amendment defenses to trademark infringement claims.[7] We now describe those standards and explain why the district court's dismissal should be reversed under all of them.

---

[7] One of these approaches — the "actual malice" test set forth in *Hoffman v. Capital Cities/ABC, Inc.*, 255 F.3d 1180 (9th Cir. 2001) — applies only to media defendants, and thus is not relevant here.

### 1. The *Rogers* Balancing Test Establishes Two Prongs For A First Amendment Defense

The district court dismissed Brown's Lanham Act claim based on its out-of-context understanding of the Second Circuit's "balancing test" test from *Rogers v. Grimaldi*, which this Court has adopted in two cases: *Mattel* and *ESS*. In *Rogers*, the famous actress Ginger Rogers argued that the title of a Federico Fellini film, *Ginger and Fred*—a movie about fictional Italian cabaret performers — created the false impression that the film was about her or that she sponsored, endorsed, or was otherwise involved in the film. Rogers lost. The Second Circuit found that a film title is "within the realm of artistic expression," such that the filmmakers had a First Amendment defense. In particular, the filmmakers' use of the name "Ginger" had artistic relevance to the film and was not explicitly misleading as to any endorsement by Ginger Rogers. *Rogers*, 875 F.2d at 1000.

The *Rogers* test thus has two prongs, both of which a defendant must satisfy to successfully trump a trademark claim with a First Amendment defense. As to the *title* of a work, which was the subject of *Rogers* and of this Court's decision in *Mattel*, the *Mattel* panel articulated the standard as follows: "literary titles do not violate the Lanham Act 'unless the title has no artistic relevance to the

27

underlying work whatsoever, or, if it has some artistic relevance,
unless the title explicitly misleads as to the source or the content of
the work.'" *Mattel*, 296 F.3d at 902. Following that test, this Court in
*Mattel* ruled that a rock band had a First Amendment defense to title a
song *Barbie Girl* without running afoul of toymaker Mattel's
trademark in the name Barbie.

This Court next applied the *Rogers* test in *ESS*. In *ESS* the
makers of the videogame *Grand Theft Auto* set out to create virtual
settings for the game that would parody real locations. One of those
settings was a version of East Los Angeles. The real East Los
Angeles is home to a strip club called Play Pen's Gentlemen's Club.
In the videogame this was artistically recreated into a similar club
called the Pig Pen. When the Play Pen brought a trademark
infringement action, it lost in the face of a First Amendment defense.

Building on the *Rogers* test as set forth in *Mattel*, the *ESS*
opinion explained that an artistic work's use of a trademark is not
actionable unless the use of the mark has no artistic relevance to the
underlying work whatsoever; or, if it has some artistic relevance,
unless it explicitly misleads as to the source or content of the work.
*ESS*, 547 F.3d at 1099. *ESS* expanded *Rogers* and *Mattel* from titles

28

to the body of a work, but only with respect to an incidental, background image: "[T]he chance to attend a virtual strip club is unambiguously *not* the main selling point of the Game." *Id.* at 1101.

The *ESS* opinion went on to conclude that the use of Play Pen's mark had "some artistic relevance" (i.e., depicting the strip club was part of creating a parody of East Los Angeles) and that the "mere use" of the Play Pen's mark in the game was not explicitly misleading (i.e., consumers would not be confused into thinking that the Play Pen was somehow behind the Pig Pen or that it sponsored the videogame). *Id.* at 1100-01. The reason it was not misleading is that the Pig Pen in *Grand Theft Auto* — unlike Brown in *Madden NFL* — was incidental to the game. *Id.* at 1100 ("the Game does not revolve around running or patronizing a strip club").

### a. The *Rogers* Test Is Inapplicable To Brown's Case

The district court relied heavily on *ESS*, and thus on the *Mattel* and *Rogers* decisions. This was error because those cases are all significantly distinguishable.

Procedurally, all three of those cases establishing the balancing test are summary judgment cases. None of them were decided on the pleadings, as was Brown's case. This is crucial, because Brown's

case raises factual issues regarding both prongs of the test that cannot be resolved on a motion to dismiss.

*Rogers* is further inapplicable because it is about the *title* of a work that was not even about Ginger Rogers. The work in question was about two fictional Italian dancers named Pippo and Amelia. As a result, "the use of the title 'Ginger and Fred' . . . only obliquely relates to Rogers and Astaire." *Rogers*, 875 F.2d at 996.

This meaningfully distinguishes *Rogers* from Brown's case, where Brown is the greatest NFL player of all time in a game about NFL football. The factual context of *Rogers* is inapplicable to Brown's case, where Brown is not in the *title* but is featured in the game.

Similarly, *Mattel* is inapplicable because it is a summary judgment case that included discovery and that relates to the *title* of a work. *Mattel* made a clear statement about consumer expectations regarding titles: "Consumers expect a title to communicate a message about the book or movie, but they do not expect it to identify the publisher or producer." *Mattel*, 296 F.3d at 902. What consumers do expect, however — in the situation like Brown's, where a celebrity is used in the game but not in the title — can be revealed only by

30

discovery, which, according to the leading trademark treatise, will demonstrate that consumers believe that celebrities are paid for the use of their personas in a product. Whether that principle applies equally to players with less celebrity than Brown is another fact that can be found only through the discovery process.

Finally, the image used in *ESS* was a background venue (a strip club) incidental to that videogame. Brown, on the other hand is not at all incidental to the *Madden NFL* games. He is a character that can be controlled by the game player. Although the game in *ESS* did not "revolve around running a strip club," the *Madden NFL* games *do* revolve around virtually controlling professional football players like Brown. A closer analogy to *ESS* would be if — instead of Brown being the plaintiff — the owner of the *stadium* where Brown played were the plaintiff. That hypothetical scenario raises the question of using another's mark in the background setting of a videogame. That is the context for the statement in *ESS* that "[i]n answering that question [about consumer confusion], we keep in mind our observation in [*Mattel*] that the mere use of a trademark alone cannot suffice to make such use explicitly misleading." *ESS*, 547 F.3d at 1100.

Further even though Brown is but one of many football players in the game, he is the best of the best — one that *Madden NFL* players would particularly want to play.  It may be that all of the players depicted deserve royalties because they are among the best football players, or perhaps that only the celebrity players deserve royalties.  In any event, these are questions of fact that should not be decided in a motion to dismiss.

> **b.  The "Artistic Relevance" Prong Of The Balancing Test Should Not Have Been Decided On A Motion To Dismiss Because It Requires Findings Of Fact**

As noted, *ESS*, *Mattel* and *Rogers* all were decided on summary judgment after factual development through discovery.  Factual disputes about whether EA's use of Brown's persona was "artistically related" to its game should have precluded dismissal of Brown's complaint on EA's motion to dismiss, as case law in analogous settings demonstrates.

The Sixth Circuit, in *Parks v. LaFace Records*, 329 F.3d 437 (6th Cir. 2003), applied the *Rogers* balancing test, and reversed a summary judgment for defendants.  In that case, Rosa Parks sued the creators of a song titled "Rosa Parks" that included the frequently repeated lyric "move to the back of the bus."

32

In evaluating the first prong of the *Rogers* test, the district court found that the "artistic relationship" between the title (i.e., Parks' name) and the content of the song was "so obvious that the matter is not open to reasonable debate." *Parks*, 329 F.3d at 452. Specifically, because Ms. Parks is universally known for her refusal to "move to the back of the bus," the use of her name was artistically related to the use of that phrase in the song. *Id.*

The Sixth Circuit, however, flatly rejected the argument that the use of Ms. Parks' name as the song's title was "artistically related" (as a symbol or metaphor) to the song merely because the song used a phrase describing conduct for which Ms. Parks became famous. *Id*. Concluding that "the artistic relationship between the title and the content of the song is certainly not obvious, and indeed, is 'open to reasonable debate,'" the Court of Appeals explained:

> [C]rying "artist" does not confer *carte blanche* authority to appropriate a celebrity's name. Furthermore, crying "symbol" does not change that proposition and confer authority to use a celebrity's name when none, in fact, may exist. *Parks*, 329 F.3d at 454.

The court went on to note that "reasonable people could find that [Parks'] name was appropriated solely because of the vastly

33

increased marketing power of a product bearing the name of a national heroine of the civil rights movement." *Parks*, 329 F.3d at 454. Thus, "whether the title Rosa Parks has any artistic relevance to the content of the song is an issue that must be resolved by a finder of fact following an evidentiary hearing and not by a judge as a matter of law upon the limited record submitted in support of a motion for summary judgment." *Id.* at 459.

Here, as in *Parks*, whether EA's use of Brown's persona is "artistically related" to EA's "message" is open to "reasonable debate." Even EA does not believe its use of Brown's persona was related to its game at all: EA repeatedly *denied* using Brown's persona in its game at all, just as the singers of *Rosa Parks* denied that that song related to Rosa Parks.[8] (*See, e.g.*, 2:3-ER-40 [EA argues that it has not used any distinctive element of Brown's persona].)

This denial *alone* creates an issue of fact about the "artistic relationship" prong that should have precluded the district court's dismissal. If, as EA claims, it did not really mean to use Brown in its game, then its alleged use of his persona could have no "artistic

---

[8] See *Parks*, 329 F.3d at 452 (quoting the lead singer of the song *Rosa Parks* as saying, "We [the band] never intended for the song to be about Rosa Parks . . . .").

relationship" to the game. *American Dairy Queen Corp. v. New Line Prods., Inc*., 35 F. Supp. 2d 727, 734-35 (D. Minn. 1998) (fact that defendant's use of "Dairy Queens" in title of motion picture was not meant to refer to the Dairy Queen company entailed no "artistic relationship," and that the facts were distinguishable from *Rogers*; use of title enjoined). Indeed it is quite possible to create a game about professional football without using real players. But EA chose instead to use recognizably real players, no doubt because that is how EA thought it could maximize its profits.

A jury here could reasonably conclude that EA used Brown's persona not to make a parody, satire, or critical commentary relating to Brown, nor any other artistic comment about Brown, but instead simply to increase profitability by exploiting Brown's extraordinary reputation and goodwill with the public to falsely imply his endorsement and increase sales. Such a possibility places EA's actions beyond the scope of "balancing test" protection on a motion to dismiss. *Parks*, 329 F.3d at 451-56. Similarly, the factual uncertainty on this issue should have precluded the district court's dismissal.

35

### c. The "Explicitly Misled" Prong Of The Balancing Test Also Requires Fact-Finding And Therefore Should Not Be Decided On A Motion To Dismiss

Whether EA "explicitly misled" the public as to Brown's endorsement is a fact-intensive inquiry that generally cannot be resolved on a motion to dismiss. As the court in *Dryer* explained when it denied a motion to dismiss a Lanham Act claim based on the defendant's unauthorized use of plaintiffs' names and images in NFL "Legacy" films under the *Rogers* balancing test: "[T]he court cannot make a determination based solely on the pleadings that the NFL's use of Plaintiffs' names and images does not explicitly mislead anyone," because that "is a fact-intensive inquiry" requiring discovery (as in *Rogers*, *Mattel* and *ESS*). *Dryer*, 689 F. Supp. 2d at 1122.

Here, Brown alleged facts from which a jury could conclude that EA "explicitly misled" the public about Brown's endorsement of the *Madden NFL* game, in at least four ways.

**First**, given the strong authority from Professor McCarthy's trademark treatise, Brown's featured presence in the game is enough to explicitly mislead. He is the star of one of the most famous championship teams in the game — not, as in *ESS*, an incidental,

background venue in a game about something else that happens outside of that venue.

**Second**, EA explicitly stated in "game feature" materials that accompanied its game that "[f]ifty of the NFL's greatest players and every All-Madden team" were included in the game (2:8(F)-ER 227). Because Brown is one of the fifty greatest NFL players of all time, and has been named to the "All Madden, All-Millennium" team, that statement explicitly represents that Brown was in EA's game.

**Third**, EA's transparently ineffective "scrambling" demonstrates an attempt to explicitly mislead the public. After using Brown's persona without permission and expressly representing that he was in the game (as described above), EA made a conscious decision to "scramble" Brown's image by changing his jersey number so that it could deny that Brown was in its game. EA's intentionally ineffective "scrambling" thus explicitly misleads as to its intent to use Brown's persona in its game, and as to its actual use of Brown's persona in its game. Such scrambling was designed to give EA plausible deniability that it did what it knew it was doing, in a way that would mislead the public about its use of Brown's persona. EA did this to heed the warnings from the NFLPA — an entity which a

37

jury found liable because of these warnings — that otherwise EA would have to pay Brown (2:2-ER-16 ¶21).

**Fourth**, EA explicitly misled both the public and Brown as to its use of Brown's persona in its game. After first representing that Brown was in its game and superficially "scrambling" Brown's image so it could deny that Brown was in its game, EA twice denied to Brown's representatives that it used Brown's persona in the game to avoid paying him the license fee it paid current NFL players. (2:8(E)-ER-226; 2:8(H)-ER-231.) EA also represented to the public that it had permission to use all individuals depicted in the game when, in fact, it did not have Brown's permission to do so. (2:9-ER-242-43.)

A jury reasonably could conclude that EA "explicitly misled" Brown and the public about EA's use of Brown's likeness and persona within the game, and about Brown's endorsement of EA's game. The district court improperly took that factual determination away from the fact-finder when it dismissed Brown's Lanham Act claim on EA's motion to dismiss. *Parks*, 329 F.3d at 463; *Dryer*, 689 F. Supp. 2d at 1122.

None of the balancing test cases address the situation presented by Brown's case. The uses in *Rogers* and *Mattel* were in the *title* of a

work, and *ESS* involved a videogame's background environment. Those cases cannot have any bearing on this case, in which Brown is part of the main event: He is a character in the game that players can control. It is reasonable to conclude that consumers interested in playing videogames allowing one to play as a famous "historic" football player would be interested in playing as the legendary Jim Brown. No doubt this is why he was included in the game rather than a generic figure.

It is also reasonable to conclude that consumers who purchased the game and played as Jim Brown would reasonably believe that Brown must have given approval for that to happen, and indeed must have endorsed the game. Only after discovery — which occurred in *Rogers*, *Mattel* and *ESS* — can a court determine whether the use of Brown's image is "explicitly misleading" — especially when the leading trademark treatise states unequivocally that such a use has long been established as explicitly misleading. 2 McCarthy on Trademarks, *supra*, § 10:43.

The district court erred in disposing of a factually-intense issue in a one-sentence footnote that ignores the distinct facts of the precedent (*ESS*) that it cites: "Mere inclusion of a celebrity's likeness

39

in the work is insufficient to satisfy the second prong of *Rogers*. [Citing *ESS*.]" (1:1-ER-9, n. 6.) Under the circumstances of this case, Brown should be able to pose that question to a jury. Here, Brown's "mere inclusion" in the game is not like the "mere use" of someone else's mark in a song or movie title, nor like the use of an incidental background mark in a videogame, as in *ESS*.[9]

To be sure, *ESS* did involve a videogame, but its similarity with Brown's case ends there. As *ESS* emphasized, the strip club was at most incidental to why people bought the game: "[T]he chance to attend a virtual strip club is unambiguously *not* the main selling point of the Game." *ESS*, 547 F.3d at 1101.

More importantly, at the summary judgment stage of the case after discovery, *ESS* explained that: "Nothing indicates that the buying public would reasonably have believed that [the strip club operator] produced the videogame or, for that matter, that [the

---

[9] *Mattel*, which is not mentioned in the district court's footnote, is irrelevant in the same way as *ESS*: "The *only* indication that Mattel [Plaintiff] might be associated with the song is the use of Barbie [the famous doll] in the title; if this were enough to satisfy this prong [i.e., the explicitly misleading element] of the *Rogers* test, it would render *Rogers* a nullity." *Mattel*, 296 F.3d at 902. This, of course, leaves open the question of how much beyond mention in a title is "enough." That question can be answered only after discovery.

producer of the videogame] operated a strip club." *Id.* at 1101. Here, using the persona of a famous sports figure in a game allowing players to play as (or against) that figure raises the factual question of whether that use is explicitly misleading.

## 2. The *Dr. Seuss* "Likelihood Of Confusion" Standard Also Favors Reversal

Before *ESS* and *Mattel*, this Court in *Dr. Seuss Enterprises, L.P. v. Penguin Books USA*, 109 F.3d 1394 (9th Cir. 1997), rejected a First Amendment "parody" defense to an unfair competition claim involving a defendant's use of plaintiff's "Dr. Seuss" marks and other elements in the title and body of a book that humorously commented on the O.J. Simpson trial. The *Dr. Seuss* opinion applied a traditional "likelihood of confusion" analysis to defendant's use of plaintiff's marks in the book to hold that confusing uses are not protected uses. *Dr. Seuss*, 109 F.3d at 1405-06.

Other courts since *Dr. Seuss* have applied the traditional likelihood of confusion analysis to evaluate First Amendment defenses to Lanham Act claims. *See, e.g., Coca-Cola Co. v. Purdy,* 382 F.3d 774, 787 (8th Cir. 2004) (rejecting an anti-abortion activist's First Amendment defense to cyber-squatting claims arising out of his use of others' marks to attract attention to his message because "[t]he

41

use of trademarks has not been protected where it is likely to create confusion as to the source or sponsorship of the speech or goods in question"); *Elvis Presley Enters., Inc. v. Capece,* 141 F.3d 188, 198-202 (5th Cir. 1997) (First Amendment defense to use of Elvis Presley's name and images as name of, and within, a bar rejected because use likely to be confusing; summary judgment for defendant reversed and summary judgment for plaintiff entered).

The district court's ruling should be reversed under this standard because of the likely and actual confusion caused by EA's unauthorized use of Brown's likeness and persona in its videogame. Likelihood of confusion is a question of fact, and Brown's factual allegations of likely confusion (e.g., 2:2-ER-20) cannot be disregarded on a motion to dismiss. *Downing*, 265 F.3d at 1008 (likelihood of confusion standard predominantly factual in nature).

### 3. The District Court's Ruling Should Be Reversed Under The "Alternative Means" Standard

The first Ninth Circuit panel to grapple with the conflict between trademark rights and the First Amendment was *IOC v. San Francisco Arts & Athletics*, 781 F.2d 733 (9th Cir. 1986), a decision later affirmed on other grounds by the Supreme Court in *SFAA v.*

42

*USOC*, 483 U.S. 522 (1987). In *IOC*, this Court rejected a First Amendment defense to a trademark infringement claim involving use of "Olympic" in the title "Gay Olympic Games."

Noting that "[m]any property rights, such as ordinary trademarks . . . can be enforced to limit protected speech without violating the Constitution," the *IOC* court held that SFAA's use of "Olympic" infringed the IOC's statutory "Olympic" trademark because "the word 'Olympic' and its associated symbols and slogans are essentially property," and because SFAA had adequate "alternative means" to convey its message. *IOC*, 781 F.2d at 737.

The *IOC* court supported its holding by citing an earlier Supreme Court decision, which held that there was no First Amendment defense to a right of publicity claim based on the unauthorized broadcast of a performer's "entire act" on the evening news. *See IOC,* 781 F.2d at 737 (citing *Zacchini v. Scripps-Howard, Inc.*, 433 U.S. 562 (1977).) Other circuits before and after *IOC* have adopted the same standard. *Mutual of Omaha Ins. Co. v. Novak*, 836 F.2d 397, 402-03 (8th Cir. 1987); *Dallas Cowboy Cheerleaders, Inc. v. Pussycat Cinema, Ltd.,* 604 F.2d 200, 206 (2d Cir. 1979).

In this case, more than the "whole act" of Jim Brown was taken. Essentially, through Brown's *Madden NFL* avatar, his whole career was taken — forever (unlike the single television broadcast of Zacchini's performance).

*IOC* was affirmed by the Supreme Court, thereby establishing that government regulation of speech involving trademark use that does not mislead or confuse is constitutionally permissible because of the government's substantial interest in protecting trademark rights. *SFAA*, 483 U.S. 522. This Court's *IOC* ruling is consistent with the principles *SFAA* articulates. Further, no subsequent decision from this Court has ever overruled, distinguished, or expressly declined to follow *IOC*'s "alternative means" test.

To the extent *IOC*'s analysis remains viable after the Supreme Court's affirmance, it supports reversal here. There are many ways EA could have conveyed its "pro NFL football" message in its *Madden NFL* game without using Brown's likeness and persona in a misleading manner, or at all. The *IOC* holding, like the Supreme Court's *SFAA* affirmance, establishes that the Olympic Act merely regulates the manner in which EA communicates its "pro NFL Football" message. *SFAA*, 483 U.S. at 536-37. Just as the "Gay

44

Olympic Games" had no First Amendment defense to use the protected term "Olympic" — because such use would "exploit the 'commercial magnetism'" of a protected mark — EA should have no right to use Brown's persona without compensating him. *SFAA*, 483 U.S. at 539, 540-41 (the First Amendment does not allow a party to appropriate someone else's mark, and thereby harvest what others have sown by exploiting imagery and goodwill those others worked to create). The district court's ruling must be reversed under this standard from the highest court to rule on this subject.

## VII. Reversal Of The Dismissal Of Brown's Federal Claim Also Requires Reversal Of The District Court's Declining To Exercise Supplemental Jurisdiction Over Brown's State Law Claims

Having rejected Brown's federal Lanham Act claim, the district court then declined to exercise supplemental jurisdiction over his state law claims. (1:1-ER-9-10.) But where the dismissal of state law claims follows in the wake of an erroneous dismissal of federal claims, and this Court reinstates the federal claim, then reversal of state law claims dismissal is appropriate. *E.g*., *Comm. Concerning Cmty. Improvement v. City of Modesto*, 583 F.3d 690, 715 (9th Cir. 2009) (district court may be "more hospitable to entertaining the state-law claims when addressed as companions to cognate federal claims"

45

reinstated after appeal); *City of L.A. v. County of Kern*, 581 F.3d 841, 849 (9th Cir. 2009) (district court to reconsider supplemental jurisdiction in light of appellate rulings on federal claims); *Elvig v. Calvin Presbyterian Church*, 375 F.3d 951, 968 (9th Cir. 2004) (dismissal of state law claims no longer warranted if premised on reversed dismissal of federal claims); *Bollard v. Cal. Province of the Soc'y of Jesus*, 196 F.3d 940, 950 (9th Cir. 1999) (same).

## VIII. CONCLUSION

Whether EA's use of Brown's persona is explicitly misleading is a question of fact that cannot be determined without discovery, particularly because it has long been well established that the public reflexively concludes that, if a celebrity is "in" something, then the celebrity must have provided permission or endorsement.

The district court below should have done what the district court in *Dryer* did, which is fundamental: refrain from making a factual determination based solely on the pleadings, and, *a fortiori*, refrain from making a factual determination contrary to the pleadings. Furthermore, the district court failed to correctly follow the precedents set by this Court in *ESS*, *Mattel*, *Dr. Seuss*, *IOC*, and by the Supreme Court in *SFAA*. Brown therefore respectfully requests that the

Lanham Act dismissal be reversed, and that his state law claims be reinstated.

Dated: July 6, 2010         MANATT, PHELPS & PHILLIPS, LLP

By: *s/Ronald S. Katz*
         Attorneys for Appellant
         James "Jim" Brown

## NOTICE OF RELATED CASE

The appeal in *Keller v. Electronic Arts, Inc.* (9th Cir. No. 10-15387), is "related" to this appeal. Pursuant to this Court's order of April 30, 2010, to the extent practicable, the *Keller* appeal and this appeal will be assigned to the same panel.


## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation of the Federal Rule of Appellate Procedure 32(a)(7)(B) and contains **9,327** words, exclusive of the corporate disclosure statement, the table of contents, the table of authorities, as counted by the 2003 Microsoft Word word-processing program used to generate this brief.

I certify that this brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using 2003 Microsoft Word word-processing program with a 14-point Times New Roman font.

Dated:  July 6, 2010                    MANATT, PHELPS & PHILLIPS, LLP

By: s/*Benjamin G. Shatz*
                    Attorneys for Appellant
                    James "Jim" Brown

## CERTIFICATE OF SERVICE

*Brown v. Electronic Arts*, 9th Cir. No. 09-56675

# APPELLANT'S  OPENING  BRIEF

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeal for the Ninth Circuit by using the appellate CM/ECF system on July 6, 2010.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

s/*Bess Hubbard*

**300062732.3**